## Ross *v.* Taylor.

(Division A. March 8, 1943. Suggestion of Error Overruled April 19, 1943.)

[12 So. (2d) 153. No. 35226.]

Travis & Travis, of Hattiesburg, and **Hugh McIntosh, Jr.,** of Collins, for appellant.

**E. L. Dent,** of Collins, for appellee.

Roberds, J., delivered the opinion of the court.

The Jones Construction Company was the main contractor for the building of a large military camp for the United States Government at what is now Camp Shelby, Mississippi. Guion & Company was a sub-contractor to construct the utilities at that camp. Appellee Taylor was the successful bidder to sell and furnish to Guion the sand-clay-gravel materials with which to build the streets, roads, and motor courts for the camp. Taylor, by written contract dated January 23, 1941, agreed to purchase from appellant Ross all of the materials needed to fulfill his contract with Guion, at 3c per cubic yard at the gravel pits, Taylor's agreement with Guion having obligated him to deliver the materials at the camp. Taylor mined and delivered a total of 141,728 cubic yards, the aggregate price of which, at 3c per yard, was $4,251.84, but he mined from the lands of Ross only 54,145 cubic yards, amounting to $1,624.35. Taylor claims that the reasons he did not mine all of the materials from the lands of Ross were (1) that the materials were not there available in quantity and quality sufficient to fulfill his contract with Guion, which Taylor asserts was a condition of his contract with Ross, and (2) that one Glenn, the general superintendent of Guion, directed him, in writing, to remove his drag-lines from the Ross lands. Taylor offered to pay Ross the sum of $1,624.35, which, being refused by Ross, Taylor paid into court under a plea of tender in this proceeding. Ross sued Taylor for $4,251.84. The jury returned a verdict for Ross for the amount of the tender. Ross appeals from that verdict and a judgment in accordance therewith.

Ross contends here that the case should be reversed and remanded, because (1) the verdict is contrary to the law applicable to the case and against the great weight of the evidence; (2) the court erred in admitting and excluding certain testimony, and (3) in granting and refusing designated instructions.

The Guion-Taylor contracts contains this provision: "Material to be in accordance with M. S. H. Y. standard specifications section 120-3 for semi-gravel dated March 15, 1934, or as directed by engineers." The letters "M. S. H. Y." mean Mississippi State Highway Department.

The Ross-Taylor contract stipulates: "This letter to confirm our understanding and agreement that I sell to you certain sand-gravel-clay materials, classed semi-gravel, for use in your Camp Shelby job around motor courts and streets, for a consideration of .03c per cubic yard. It is understood and agreed that you are to get your entire requirements of such materials from lands described below, provided such materials are available both in quality and quantity." The Ross lands consisted of 440 acres.

On January 30, 1941, Glenn wrote Taylor this letter: "You are instructed to move your dragline from its present location to a gravel pit containing more metal in the material." Taylor then had some four or five draglines in the Ross pit. He immediately removed some of them to separate lands of Weldy and Fairley, leaving two or three draglines in the Ross pit. The Fairley tract adjoins, but the Weldy tract is several miles from, the Ross lands. The operations by Taylor continued from January 23rd to February 20th, and to the last, Taylor continued to mine some of the materials from the Ross lands.

Considering now the first contention of appellant, it will be noted the Guion-Taylor contract required that the quality of the materials be in accordance with standard specifications of the Mississippi Highway Department, "or as directed by the engineers," and the Taylor-Ross agreement obligated Taylor to mine all of the materials from the lands of Ross, provided they were there available both in quality and quantity to enable Taylor to fulfill his contract with Guion. Appellant says that the word "engineers" had reference to, and included only, the engineers of the United States Government, who were Lockwood and Green and the engineers under them, in

charge of the construction of the camp for the Government. Taylor says the engineer for Guion was included. The Government's engineers never objected to the quality of the materials. Guion's engineer did. It is not necessary for us to decide what engineer was meant. The power of the engineer to direct was one condition. The requirement as to standard of quality and that the materials be available in such quantity on the Ross lands as would enable Taylor to fulfill his contract with Guion were other conditions. These latter conditions involve questions of fact. The jury decided the questions against appellant, who now strongly contends, as his main ground of appeal, that this verdict was against the great weight of the evidence, requiring a reversal and remand of the case. That necessitates a summary of the testimony on these questions, which we shall attempt to make.

The plaintiff, appellant, introduced three engineers, —Jackson, Breeland, and Estes.

Mr. Jackson testified that he had been a licensed engineer since 1939, and that he was the engineer in actual charge of the building of roads, motor courts, and streets at the camp, and was employed under Lockwood and Green; that he had final authority, subject to the approval of the Government quartermaster, to say whether the materials came up to requirements; that he was familiar with the Ross pit; that he had not made a definite survey of the Ross lands, but had been there a number of times; that a number of tests of the Ross gravel had been made, and samples had been sent to the Mississippi Highway Department for examination; that he did not personally procure and send the samples; that said samples, according to the laboratory reports, met the requirements, and that, in his opinion, the Ross gravel met the standards required by the Guion and Taylor contracts.

Mr. Breeland testified that he was a licensed civil engineer of several years' experience and was under the employ of Lockwood and Green, inspecting, at first,

the concrete pavement, and, later, the streets and motor courts; that prior to this employment he was working for the Mississippi State Highway Department; that while so working for the Highway Department, and a short time before the work on this camp started, he bored for and obtained samples of road materials from the Fairley land, and the Highway Department of Mississippi made a test of these samples, and this test showed the samples met the requirements of the Guion contract; that during the construction of the camp he was at the Ross pit a number of times, and that, in his opinion, the Ross lands contained twenty-five to thirty thousand cubic yards of suitable materials per acre.

Mr. Estes testified that he was a civil engineer of thirty-three years' experience, and that, at the request of Mr. Ross, he inspected the Ross pit about a week before the trial, made borings on the land, procured samples therefrom, and sent two samples to the laboratories of the Mississippi Highway Department. He produced the reports on these tests, which showed the materials met the requirements of the Taylor contract; that from this report and this examination of the Ross lands, it was his opinion that Ross' lands contained sufficient material in quantity and quality to meet the Taylor contract.

The substance of the testimony on this point on behalf of Mr. Taylor was this: Mr. Taylor himself testified that before procuring his present contract he was assistant superintendent in charge of the secondary roads at Camp Shelby; that he had been in the road and gravel business all of his life, and his father ahead of him was in that business; that he was familiar with such materials and with the requirements of the Mississippi State Highway Department; that he had built roads for that department, and that the materials on the Ross land did not meet the requirements of his contract; that it was possible to get samples from the Ross land which would meet the tests, but it was impossible for him to secure enough out of the Ross pit to fulfill his contract; that the Ross gravel was suitable in some places but not

available in sufficient quantity and quality to meet his requirements; that ''The Ross pit would have spots in it that would pass the Mississippi State Highway Department specifications, but I had to deliver not less than five thousand yards a day, and did deliver as high as eight thousand a day. It was impossible for me to secure enough out of that pit that would pass the Department. It would be possible to get samples there that would pass;'' that this was a war-time, hurry-up job; that he checked the Ross lands, and some parts were suitable, and some were not; that he left two or three draglines at the Ross pit because ''it was suitable for some places''; that ''I can go there and get a sample that will pass, and I can go get a sample that won't pass.''

R. T. Myers testified that he had been a civil engineer and contractor all of his life; that he was a licensed engineer; that he was construction superintendent for Guion and had charge of outside work, streets, road and drainage construction, and that it was his duty to pass on the quality and quantity of the materials used in doing this work; that Glenn was general superintendent for Guion; that he, Myers, was away from the work for some ten days, and when he returned, the motor courts were being paved, and that he noticed the gravel which had been hauled and placed there during his absence was not suitable for the purpose, and so reported to Mr. Glenn. He then went to the Ross pit and examined the gravel, concluding ''that the gravel there wasn't the proper material,'' and he told Mr. Taylor to move from that pit, and had Mr. Glenn write Mr. Taylor the foregoing letter. He further said ''We were paving the parking lots and motor courts. And the gravel hauled there did not have any metal in it, and would not set up. And it wasn't suitable for the purposes.'' He was asked this question ''but with reference to quality and quantity required for this job which it was intended for? A. It was when I first started, but it run out.'' He later said that there was not suitable gravel at the Ross pit to ''keep all the equipment there.'' He further said that some of the

gravel was good and some of it was bad, and that "it wasn't there in enough quantity."

Mr. W. B. Thigpen testified that he lived in Hattiesburg and had been in the gravel business for eleven or twelve years and that he had charge of a dragline which was being operated in the Ross pit, and that his dragline was moved from that pit because "they wanted some gravel for motor courts, and they had to have gravel that had more clay to it"; that he had sold gravel for twelve years to the Mississippi Highway Department, was familiar with the different kinds of gravel, and "I didn't think there was any comparison between it and the gravel we moved to make these motor courts and things out of"; that part of the Ross gravel had, and part had not, sufficient clay percentage for building motor courts.

Mr. Charles Dobbs testified that for several years he had been engaged in highway maintenance work and was familiar with road materials and the requirements of the Mississippi State Highway Department; that he was construction foreman for Mr. Taylor on this job; that Taylor operated about 125 trucks; that there was a difference between gravel used for building streets and that used for motor courts; that the Ross gravel was good used as a base for black-topping, but "for something you want to set up by, this other gravel was the best for that."

It is further shown, without dispute, that Mr. Ross knew the requirements of the Guion-Taylor contract and that this was war-time, emergency work. Time was an important element in Taylor's job. Even if sufficient materials of proper quality could have been located on the entire Ross tract, yet if it was in spots, as the jury might have determined the fact to be, time and expense would have prevented Taylor from moving his machinery from place to place on the lands to find sufficient quantity of the right quality. The word "available" in the Ross-Taylor contract, as applied to the situation here, would appear to embrace these elements. The jury, with the contracts and all the proof before it, found as a fact that

the materials were not "available both in quality and quantity" on the Ross tract to enable Taylor to fulfill his contract with Guion, and we cannot say there was not sufficient evidence to support the verdict.

We have examined and thoroughly considered the contentions as to instructions and the exclusion and admission of testimony, and find no reversible error, if error at all, in this regard.

Affirmed.